UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY C. ZEBARI,

          Plaintiff,

vs.

          Case No. 05-CV-72924

          HON. GEORGE CARAM STEEH

THE PEPSI BOTTLING CO.,

          Defendant.
_____/

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AS TO HOSTILE WORK ENVIRONMENT
AND DISCRIMINATION (COUNTS I, III, AND IV) AND DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AS TO RETALIATION (COUNTS II AND V)

      This case arises out of plaintiff Larry ("Chris") Zebari's complaint against his employer, defendant Pepsi Bottling Group ("PBG"), alleging retaliation, discrimination and harassment based on his ethnicity. Plaintiff's claims of hostile work environment and harassment fail for the reasons stated below, and his claim of discrimination has been waived. Plaintiff's claims of retaliation survive as described below. Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

FACTUAL BACKGROUND

      As required, the facts are stated in the light most favorable to the plaintiff. Chris Zebari is of Chaldean descent. He worked for PBG in various sales positions for 14 years. PBG's Detroit Market Unit first hired Zebari on October 8, 1990. Zebari received above-target and on-target performance evaluations each year from 1990 through 2003, except for the year 2002 when he received a below-target review. He received 17 pay

increases for merit or promotion, was promoted three times and was retained in two reorganizations.

Zebari started with PBG as a management trainee, and was soon promoted to district sales manager for Detroit. Due to a reorganization, Zebari was assigned to the position of account development representative in November, 1992. Zebari was promoted to Territory Development Manager in June, 1997. His next assignment was Key Account Manager (KAM) in 1999, where he was responsible for increasing volume in urban business. In October, 2001, Zebari was promoted to Territory Sales Manager (TSM), managing sales reps and drivers in the inner city. While Zebari's preference was to remain in the KAM position, his prior job was being eliminated and this promotion was his only alternative.

In the TSM position, Zebari was supervised by Jeff Vickerman and Scott McKinnon. Zebari had a prior history with McKinnon, who he described as rude and hostile toward Zebari and PBG's Chaldean customers. (Zebari dep., pp. 237-39). Zebari contends that he had been subjected to harassment throughout his employment with PBG because he is Chaldean, but he considers his problems to have begun with his move to McKinnon's supervision.

A. Ron Sorey

Zebari describes problems with a co-worker, Ron Sorey, who physically assaulted him several times. On February 7, 2001, Sorey and Zebari made a delivery together and then met Zebari's family for dinner. Sorey allegedly became intoxicated and embarrassed Zebari in front of his family and friends. Zebari left with Sorey, and in the car, Sorey struck Zebari in the eye.

In July 2001, Sorey and Zebari were at a golf outing put on by the Associated Food Dealers. Sorey threw Zebari down on the ground. This incident was witnessed by many PBG employees and managers, and even caught on video, but no action was taken against Sorey.

In January, 2002, Sorey and Zebari were attending a black-tie party at the Marriott during the Mayor Kilpatrick inauguration weekend. PBG paid a sponsorship fee for the party with the understanding that only Pepsi products would be served, but in fact only Coke products were served. The event was Sorey's responsibility, and when Zebari attempted to talk to Sorey, he claims Sorey struck him in the chest, saying that Zebari was five minutes away from "getting your Chaldean ass kicked." Zebari complained to Jeff Vickerman, who reported the incident to Jerry Williams, the HR representative. Vickerman and Williams promised Zebari the matter would be taken care of, yet nothing happened. On January 7, 2002, Zebari prepared a letter referencing Sorey's violence and "ethnically laced slurs" and gave it to Williams for inclusion in Sorey's file.

Shortly thereafter, Zebari was given a disciplinary memo by Vickerman for being "aggressive and confrontational" and blaming him for the incident at the Marriott with Sorey, for a parking lot incident with Pepsi employee Sean Franulic, and for a third incident in which Zebari is accused of threatening an employee's spouse. (Plaintiff's Exhibit 12). Zebari was required to attend behavior modification to maintain his employment. On February 25, 2002, Zebari wrote a letter in response which he delivered to Vickerman and Williams. This letter referred to the incidents cited by Vickerman as the basis for his discipline, as well as his strong work ethic, but did not

3

make reference to any ethnically-based harassment. On March 5, 2002, Zebari wrote another letter to Vickerman in response to the disciplinary memo, this time referring to the treatment he had been subjected to based on his ethnic heritage. Specifically, Zebari wrote:

> From the inception of my employment through the present I am reminded by co-workers of my ethnic heritage of which I am very proud. I am talked down to. I am joked at. All Arabs regardless of their particular ethnic background are referred to continually as my "cousins". The Human Resources Department has a record of several complaints I filed. To my knowledge, nothing was ever done about it as the practice continues to this day. I have lived with it, but the ignorance of the people who would engage in such conduct does not reduce the hurt or soothe the wounds.

In July 2002, Zebari was transferred to a KAM position allegedly due to poor performance in the TSM position. In August 2002, Zebari learned that Sorey's personnel file did not contain any documentation of his attacks on Zebari. Zebari told Jordana Holman from Human Resources his history with Sorey, including that he had a tape of the time Sorey threw him on the grass. On September 20, 2002, Zebari received a written reprimand for allegedly discussing an unrelated investigation of a co-worker and having a security tape in his possession. The reprimand was described as a "final warning" and was signed by Zebari, Vickerman and Mike Schlaman.

B. Move to Tri-County Market

On September 6, 2002, Zebari requested a transfer to PBG's Howell facility or to PBG's sister company Frito-Lay. In December, 2002, Zebari's KAM position was scheduled for elimination. At that time, Greg Moore, PBG's General Manager for the Tri-County Market Unit was beginning an urban market development program. Moore told Sean McDevitt, the Central Business Unit's Human Resource Director, that he

needed someone to fill the urban KAM position.  McDevitt told Moore that Zebari was available.  Zebari had worked for Moore in 1997 and 1998, and Zebari admits that Moore did not discriminate against him during that time.  Zebari accepted the transfer to the urban KAM position in Pontiac.

When Zebari received his negative 2002 review, he met with Moore, who told him to put what happened in Detroit with McKinnon behind him.  Zebari also met with Scott Gillesby, the senior vice president of the central business unit and Sean McDevitt, who told Zebari to leave what happened in Detroit without resolution and to move forward.

    C.  <u>Steve Mayer</u>

At the end of 2003, Zebari received a good review and a merit increase from Moore based on his performance in the Pontiac position.  Then Zebari was transitioned from Moore to Mike Sobutka as supervisor.  Sobutka was the Tri-County's Director of Retail Sales, and the urban KAM position was a retail sales position.  At this time Zebari alleges that he began to suffer ethnic hostility similar to what he had experienced in Detroit.  Saginaw manager Steve Mayer made several anti-Arabic statements, and was confrontational with Zebari about his expenses and work schedule.  Zebari memorialized the situation with Mayer in a memo to Sobutka in May, 2004.  The memo generally refers to Mayer's "demeanor and overall treatment" of Zebari and a "pattern of disrespectful behavior."  The memo does not point out any ethnic discrimination other than the cryptic comment, "I do not wish to be treated in any manner consistent with what I left in Detroit (I will not digress into that in this forum)."  Zebari admits that after

5

he complained to Sobutka, Mayer did not make any anti-Chaldean statements, complain about Zebari's performance, or say anything negative about Zebari.

    D.  Greg Moore

In August 2004, Moore met with Zebari about his expenses, specifically questioning whether the individuals entertained in two of the questioned expenses were customers of Tri-County and why a third expense did not identify the reason for the expense. Zebari alleges Moore said, "Being Arab is not license to spend like a rock star," and "I told you not to spend a f–ing dime with the Associated Food Dealers. These f–ing people don't do a thing for me." The Associated Food Dealers is an organization of independent grocers, most of whom are Chaldean. There is conflicting testimony whether Zebari threw his company credit card on Moore's desk, or whether Moore confiscated the card. Moore claims that Zebari came back to his office later that day and said, "I don't need Pepsi-Cola anymore. I have other opportunities and I'm moving on and I'm done with this."

    E.  Diversity Advisory Council

On September 23, 2004, Scott Gillesby issued a memo to all market unit employees announcing the formation of a Business Unit Diversity Advisory Council. Zebari sent a letter to Gillesby and McDevitt questioning the failure to include a person of Arabic descent on the council, and recommending that this would be a good idea given the failure to PBG to hire managers of Middle Eastern descent and the ridicule leveled at Middle Eastern customers by all levels of the organization. Zebari never received a response to his letter.

### F. Bottle Redemption Scam

In October 2004, Moore called Zebari in to speak with Terry McKinney, the security manager, about a bottle redemption scam. Zebari's name had allegedly been mentioned in an anonymous call to PBG's hot line. Present at the meeting was McKinney, Human Resources Manager Stephanie Hopson, and Detroit police officer Ira Todd. Zebari complained about being ethnically profiled because a Chaldean store was involved. While some non-Chaldeans were also being investigated, those individuals had some relationship to the store at the center of the alleged scam, either because they made deliveries there or it was their account. Zebari had no relationship to the market, other than sharing the same ethnicity as its owner. Zebari was eventually cleared of any involvement in the alleged scam, as were the other PBG employees.

### G. Termination

In October, 2004, Moore was told by PBG that he needed to reduce his personnel budget by $250,000. Sobutka told Moore he no longer needed an urban KAM because the program was established. On October 20, 2004, Moore met with Zebari off-site to discuss the planned reduction in workforce. Moore purportedly stated that Zebari had "been through so much", it was "not a healthy environment for you anymore", he had "burned all his bridges", and being investigated for the bottle scam was a problem. Zebari maintains that he indicated he had no interest in quitting. Moore's testimony is that Zebari said he would leave if the severance package was good. Zebari stated that he called his wife after the meeting and told her he thought the end was near, but that Moore indicated he would be offered the best severance package in Pepsi history.

The Tri-County unit discharged five employees, and eliminated the urban KAM position. Zebari was terminated on December 7, 2004. The decision to terminate Zebari was made by Stephanie Hopson and Moore. Zebari was offered an enhanced severance package of $32,873.06 in return for signing a release, which he turned down.

On July 25, 2005, Zebari filed a five count complaint against PBG. Counts I and III allege hostile environment harassment based on ancestry, in violation of 42 U.S.C. § 1981 and ELCRA. Counts II and V allege retaliation based on ancestry in violation of the same statutes. Count IV alleges discrimination because of his ethnicity in violation of ELCRA. Count IV is waived by plaintiff, as it was not addressed in his response to summary judgment or at oral argument.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

ANALYSIS

I. Retaliation

    A. Prima Facie Case

Zebari alleges that he was terminated in retaliation for his complaints of discrimination and harassment based on his ethnicity. To establish a prima facie case of retaliation, Zebari must demonstrate (1) that he engaged in a protected activity, (2) that this was known by the defendant, (3) that defendant took an employment action adverse to plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. Balmer v. HCA, Inc., 423 F.3d 606, 613-14 (6th Cir. 2005). Protected activity includes both opposition to violations of 42 U.S.C. § 1981 or the ELCRA, and participation which requires actually making a charge or complaint or participating in an investigation or proceeding. Booker v. Brown & Williamson Tobacco, Inc., 879 F.2d 1304, 1312-13 (6th Cir. 1989).

    1. Protected Activity

Zebari contends that his protected activity began in January, 2002, when he complained in writing about ethnically motivated assaults by co-worker Ron Sorey. Zebari alleges that Sorey threatened to "kick [his] Chaldean ass," and in a memo following the incident Zebari refers to Sorey's "ethnically laced slurs." Zebari was not satisfied with defendant's handling of the Sorey incidents and followed-up with other complaints to HR.

In February, 2003, Zebari received a negative performance evaluation from McKinnon regarding his employment as a KAM in Detroit. Zebari met with his then-supervisor Moore, and called McKinnon "a liar, bigot, racist and incompetent." When

10

Zebari complained to Moore, he was told to put what happened in Detroit with McKinnon behind him.

In September, 2004, in protest of the lack of Arabic representation on the newly created diversity council, Zebari wrote a letter to Scott Gillesby and Sean McDevitt. In the letter, Zebari suggests that people of Middle Eastern heritage should have representation on the council because a large number of PBG's customers are of Middle Eastern descent. The letter contains charges that all levels of PBG employees have mocked and ridiculed these customers in the past. However, the letter does not allege any employment-related discriminatory act, and therefore does not constitute protected activity.

In October, 2004, Zebari was the subject of a bottle redemption scam investigation to which he claims to have had no connection other than his shared ethnicity with the store owner at the center of the scam. During his interview by Terry McKinney, Zebari complained that he was being harassed because of his ethnicity. However, at the time he complained, Zebari knew that he had been named in a hot line call and was accused of being involved in the scam. Zebari admits that if he was named in the hot line call it was proper to interview him. (Zebari dep., pp. 394-95) Zebari also knew that non-Chaldean employees were being interviewed in connection with the alleged scam, including Paul Brewer who was also named in the hot line call. Zebari's claim of discrimination was not made in good faith and does not constitute protected activity. Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989).

2. <u>Defendant's Knowledge</u>

Moore was the primary person who made the decision to terminate Zebari, so Zebari must demonstrate that Moore was aware of his complaints of ethnic discrimination. Zebari contends that he complained directly to Moore, and in addition he complained to his other supervisors who communicated those complaints to Moore.

Moore met with Zebari in 2003 to discuss his negative 2002 review. At the meeting, Zebari referred to McKinnon as a bigot and a racist. Moore told Zebari to put what happened in Detroit with McKinnon behind him. This is not evidence that Moore knew about specific allegations of ethnic discrimination previously made by Zebari. At best Moore was on notice that Zebari was accusing McKinnon of harboring racist opinions generally.

With regard to the bottle redemption scam investigation, Moore was not present during McKinney's interview, and did not see McKinney's final report which included Zebari's complaint that the investigation itself was undertaken because of ethnic profiling. Moore testified he was unaware of Zebari's allegation that he was interviewed because of his ethnicity, and Zebari even admits that when he met with Moore in October, 2004, Moore appeared not to know what happened during the investigation. Zebari alleges that Moore made the statement that Zebari burned all his bridges, but this does not refer specifically to any protected activity.

Zebari claims that Vickerman told Moore about Zebari's "situation in Detroit." Vickerman testified that before Zebari moved to the Tri-County Market Unit, he spoke to Moore about several things. Vickerman told Moore that Zebari had created distractions in Detroit, giving as an example the Sorey investigation. Second, he talked to Moore

about Zebari's travel and expense spending in 2002, which was considered by Vickerman to be excessive.

Hopson was also involved in the decision to terminate Zebari. Hopson was present during McKinney's interview of Zebari, so she would have known of his complaints of ethnic discrimination. However, these complaints were not made in good faith since Zebari, himself, acknowledges that there was nothing improper about investigating the "tip" concerning a purported bottle scam. Zebari also claims that Hopson knew about his letter regarding the Diversity Council. This is not material because the letter is not evidence of a claim of ethnic discrimination in employment. Hopson also testified that she never talked to Moore about the letter.

There is evidence that at least Moore had knowledge to support a prima facie case of retaliation.

### 3. Adverse Employment Action

The adverse employment action initially alleged by Zebari included unwarranted discipline, a transfer to a less desirable position, and finally, termination. At oral argument, plaintiff's counsel acknowledged that this is really a termination case only.

### 4. Causal Connection

Zebari alleges a pattern of retaliatory conduct commencing after his first letter to management complaining of harassment based on ethnicity in September, 2002. Plaintiff contends he was transferred to a new market, his future complaints of harassment were ignored, and finally he was terminated. In his conversation with Moore prior to his termination, Moore allegedly said, "you've been through so much and it's just not a healthy environment for you anymore." Moore told Zebari that he had

13

"burned all his bridges," that the letter to Gillesby and McDevitt "did not sit well" and that being investigated for the bottle scam was also a problem. While these statements do not specifically refer to protected activity, there is at least enough evidence to support an inference of a causal connection.

Zebari has produced enough evidence to establish a prima facie case of retaliation.

### B.  Legitimate Nondiscriminatory Explanation

Once plaintiff establishes a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate, nondiscriminatory explanation for the adverse actions. Texas Bd. of Community Affairs v. Burdine, 450 U.S. 248 (1981). The plaintiff must then show that the employer's articulated reason was pretext for intentional retaliation. To establish pretext, the plaintiff must produce sufficient evidence from which the jury could "reasonably reject the defendant's explanation" and infer that the defendant "intentionally discriminated" against him. Balmer v. H.C.A., Inc., 423 F.3d 606, 614 (6th Cir. 2005).

Moore testified that he no longer needed a KAM dedicated to the urban development program. (Moore dep., p. 108). This testimony is supported by Sobutka. (Sobutka dep., p. 49-50) and Hopson (Hopson dep., p. 37). While two other KAMs in the Tri-County market were not terminated, they had different responsibilities than Zebari. Specifically, one retained KAM was responsible for the small market format and the other was responsible for the large markets format.

There were four other employees terminated at the same time as Zebari. Each of those terminated employees were chosen for performance or behavior-related

issues. Jason Firment, a KAM, was terminated due to job performance. Nate Rouse, a warehouse employee, was terminated for workplace violence. Troy Streeter, a driver, was terminated for attendance issues. Ora Lee Levy was terminated for being drunk on the job. According to Hopson, Zebari was terminated at the same time as the others as part of a head count, but due to job elimination as opposed to any misconduct or job performance issues. While no employee has filled Zebari's urban KAM position, Zebari's key accounts were reassigned.

Moore testified that he chose Zebari for termination for two reasons. One, because he no longer had a need for an urban KAM, and two, because Zebari had expressed a desire to leave PBG. However, Zebari testified that he never told Moore he wanted to leave, and Hopson testified that Moore never told her that Zebari had an interest in leaving or was unhappy.

The fact finder in this case could conclude that Zebari was terminated for an improper purpose if they determine that Moore was untruthful about the reasons for selecting Zebari for termination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). The fact that the other employees were terminated for misconduct or job performance reasons could lead the fact finder to conclude that job elimination was a pretext for retaliation in the case of Zebari.

II. Discrimination

PBG briefed the issue of discrimination in its motion for summary judgment and Zebari did not respond. The two counts related to this claim have been waived by plaintiff.

III. Hostile Work Environment

To prove a prima facie case of hostile work environment, Zebari must show that (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on his ethnicity, (4) the harassment created a hostile work environment, and (5) the employer is liable. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). The harassment must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive environment both to a reasonable person and the actual victim. Harris v. Forklift Sys., 510 U.S. 17, 21-22 (1993).

The court must consider the totality of the circumstances in determining whether the harassment the sufficiently severe. Specifically, the court must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." Id. at 23. Offensive comments and behaviors which create the hostile work environment need not have been directed at a plaintiff to constitute conduct violative of Title VII and Elliott-Larsen. Jackson v. Quanex, 191 F.3d 647, 660 (6th Cir. 1999).

Being of Iraqi-Chaldean descent, Zebari was a member of a protected class. Zebari submits a document that he prepared in which he chronicles incidents of anti-Arab harassment from 1990 to 2002. The document includes allegations of disparaging remarks and insults from co-workers and supervisors directed at him, derogatory comments about his wife and daughter, jokes about his food, and negative comments about Chaldeans in general. According to the document, the years 1997 to 2000 were

good ones for Zebari at PBG. Therefore, the Court will not consider any claims of harassment prior to 2000 in its analysis.

Zebari alleges harassing conduct in the form of physical assaults by Sorey, who was never disciplined for his behavior. Sorey made a stray comment about kicking Zebari's Chaldean ass, but the facts surrounding the incidents indicate there were provocations for the assaults other than Zebari's ethnicity. Zebari received discipline following the Sorey incident in the form of mandatory anger management. PBG argues that the Sorey incident is barred by the three year statute of limitations, but the court could consider it in its totality of the circumstances analysis. National Railroad Passenger Corp. v. Morgan, 122 S.Ct. 2061, 2077 (2002).

Zebari claims his supervisor Moore challenged his expenses and claimed they had something to do with his ethnicity. Moore's comments were in relation to PBG not spending the kind of money they did in Pontiac to establish a program in Saginaw. The comments related to business issues and not Zebari's ethnicity. Steven Mayer made disparaging remarks about Arabs, however, Mayer's behavior stopped after Zebari complained to management.

Zebari claims he was implicated in a bottle scam solely because he was Chaldean. However, the evidence clearly shows he was investigated because he was named in a hot line call.

Importantly, Zebari cannot prove that the activity he complains of affected his employment. In December, 2003, he wrote a letter to Kurt Norman stating how happy he was to work in the Tri-County Market Unit. Zebari also admits that as of October 20, 2004, the date he met with Moore, he loved working for PBG and did not want to look

for other employment. An employee who admits that he likes working for the employer cannot prove that the hostile environment affected his employment. <u>Crawford v. Medina Hospital</u>, 96 F.3d 830, 836 (6th Cir. 1996). Zebari's harassment claim fails because his own testimony supports the conclusion that the alleged harassment did not alter a condition of his employment. (Zebari dep., pp. 397-400).

## CONCLUSION

Defendant's motion for summary judgment is GRANTED as to plaintiff's claims of harassment and discrimination, and DENIED as to plaintiff's claims of retaliation.


Dated: April 5, 2007

                                                    <u>S/George Caram Steeh</u>
                                                    GEORGE CARAM STEEH
                                                    UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 5, 2007, by electronic and/or ordinary mail.

<u>s/Josephine Chaffee</u>
Deputy Clerk

---